Good morning. We'll hear the case United States v. Ventura. Please be sure to speak into the mic. May it please the court. My name is Peter Goldberger. It's my privilege this morning to represent the appellant, Jose Ismael Ventura, known as Milo, who was the defendant below. And I've reserved one minute for rebuttal. After a jury trial in the spring of 2015, Mr. Ventura was convicted on three counts for ordering a murder over control of a marijuana business in Upper Manhattan. The incident occurred nearly 20 years earlier, in August 1996, and resulted in two deaths. The appeal raises two issues. The first, the trial court admitted over objection extensive evidence of what Judge Coltle called a horrific arson murder that occurred more than a year earlier than the charged offenses. And second, I'm discussing the improper removal and replacement of a juror during deliberations. The district court held that the evidence of the earlier crime was admissible to complete the story or to show the relationship among the conspirators. Well, it was to show how they had a relationship of trust and confidence that they had worked together before the crime that the jury had, right? And we look at it under an abuse of discretion standard, correct? That's correct. And it's a balancing test, correct? It is. Under 403. I mean, the way Judge Coltle framed it, it was a balancing test. Yes, and we agree that it ultimately is a 403 issue. So as an appellate court, we have to give a fair amount of discretion to the district judge when he in fact is balancing the probative value versus the risk of undue prejudice in this case, right? Yes, of course. So why did he not do that within his discretion? I realize this is a soliloquy rather than a question. I understand. But it seems to me that he gave limiting instruction. He gave both when it came in and at the end that was not objected to and that he limited what the government could do in regard to your client's lack of direct involvement in the prior crime. That's a lot, but go ahead. And as you're answering that question, the government urges us to look at this question under plain error review, doesn't it? Yes. Right? So you also have to show how the 403 issue prejudicially affected Ventura's substantial rights, given the other evidence against him which Judge Stein has— Let me start there, if I may, with the prior question of the standard of review. So we addressed this in the opening brief and got back to it in the reply, both. We rely on this Court's precedent and a very similar case in the Third Circuit written by then-Judge Alito, holding that this—and that's the Murray case—that in 403 situations of this kind, the judge—many issues really need an objection to be raised again at trial, which is the government's position, but the pretrial analysis is sometimes sufficient. We rely on the cases which show that in a situation like this, where nothing unexpected occurred at trial, where there was thorough vetting before trial, that the parties argued their positions, they are the same positions that arose at trial, and the judge made a considered ruling. This gets to Judge Stein's point. And so the issue that was preserved pretrial is sufficient to carry the day on the evidence for an ordinary abuse of discretion standard, not a plain error standard. The reason why—the important reason why there is an abuse of discretion here is that there is an underlying legal question that you have to address first. Essentially, the rationale adopted by the trial court, and it's not unusual, is a res gestae theory, what used to be called the res gestae theory, the completing the story relationship of the parties. But the better view, and articulated in some of this Court's cases, and we're urging the Court in this case to address it and articulate it and define it better in our decision, is that the proper limitation is one of intrinsic evidence. The evidence should be such that it directly tends to prove the charge at issue. When we're talking about another crime, especially a highly prejudicial other crime, the evidence should be intrinsic. And here we don't have that, nor was it necessary. And because there was plenty of other evidence about the relationship of the parties, including their trust relationship, many of them were members of a family or close friends of the family. So it was completely unnecessary to go into the details through five witnesses and two days of testimony of an uncharged murder. The other limitation is that the government— I'm sorry. If I remember correctly, and I don't mean to stop your flow, there's a reference that 20 percent of the government's case related to the prior crime. Is that accurate? I did two calculations by pages and by time, and they came out a little differently. One of them was 20 percent, and I don't remember which was which, but I counted it on my fingers pretty carefully. That's about—I think that's a fair estimate. The government didn't dispute it, that that was so. This was not one witness. It wasn't a passing reference. It was how the government started their case. And—and this gets right to where I was a second ago— the other limitation on this kind of ruling, which tends to undermine the policy of Rule 404B when you're talking about another crime, is that the government must never rely on such evidence for propensity. And yet the theme of the closing argument, and especially the culmination, the climax of the government's rebuttal argument, was the line, Mr. Ventura did what he always did. He did, in this charge—in the charged case, what he always did, which the jury could readily have thought referred back to the other offense that was charged, that was uncharged but extensively discussed, especially where he did what he had to do. Who he took care of his business was repeatedly stated in— it was a rhetorical flourish that was used repeatedly in the discussion of the earlier offense in the closing. The instruction says, right, the defendant is not charged with the arson of Noel Montanez's store or the murder of Noel Montanez. That's the limiting instruction. The limiting instruction, right? Yes. The defendant is not accused of committing these—those crimes. This is not on trial for having committed those crimes. Right. You may not consider those crimes as a substitute for proof that the defendant committed the crimes charged in the indictment. And—but propensity is more than a substitute. Propensity is—makes it more likely—it's not a substitute, but it makes it more likely than the jury might otherwise think it was to—that he committed this crime, given that it was 20 years ago and there's no direct evidence. It's all the evidence of highly questionable, credibility-challenged witnesses. Well, you've got Ventura's sister, Clara, right? Many witnesses. I don't—I understand. I have— You heard from Norris Castellanos, right? Yes. Yes. There are many, many witnesses, and they knew each other. And they are all accused and in making deals with the government that the jury might have doubted. But if I could turn with less than two minutes to the other issue, which does in fact— Well, let me just be clear. Sure. We'll give you some more time. I just want to be sure on the standard overview question. So Ventura did object to the—to the introduction— in an—to the introduction of any evidence of Montanez's arson murder, but at any point did—did he object to the government's presentation of evidence at trial as inconsistent with a pretrial representation where the district courts eliminate ruling? No, he did not. But that's not—although I talk about that in the brief, that's not the error that we— we're not claiming that the error is that the government broke their promise. The error was admitting the evidence in violation of Rule 403, and that's what was—that was what was objected to. And the McDermott case tells us—I think that's the one we rely on in the Second Circuit case that says that that's a sufficient—yes, McDermott from 2001 is the case that says this is a sufficient objection to get an ordinary refeal. I mean, you say in your—in your brief on page 32 that your 403 argument is preserved under McDermott. Yes. But when you look at pages 27 to 29, you seem to be arguing at length that the prosecution's evidence at trial violated the promises and representations the government made to the district court at the in limine stage of the proceedings, right? It did. Yeah. It did. And that's showing—that's part of the showing of how unfair it was, but it's not the error. Okay. That's—that's my point. And it would be necessary—it's necessary to discuss that to show—may I get to the second issue for a moment? Of course. Thank you. So a new trial is also required here because of the manner in which the deliberating juror came to be removed. In 1997, in a case called Thomas, this Court strongly established a bright-line rule, and for very good reason. And in the 15 years since then, the Court—or, sorry, in all the years since then, the Court has not retreated from that rule, even though it has sometimes on the facts of particular cases been distinguished. The rule is this, if I may. If the record discloses any possibility that the request to discharge a juror stems from the juror's view of the sufficiency of the government's evidence, then the Court must deny the request. Yes. So it's an— Those cases are when there's an indication that the juror is favoring one side or the other. Yes. That's right. The note here from the jury is honorable codal. Many members of the jury of concerns with juror number two, once he said, I have a problem with anyone who has an agreement with the government, end quote. Yes. That goes to your point. That's our point. But that's just— That is the possibility right there. That's just a smidgen. He then goes on. The note goes on. We are concerned that he will not be fair and open-minded, as well as he will not apply the instructions as to the law to the evidence. He is not open to discussion. Then Judge Codal properly has an in-camera discussion with the attorneys present, and it turns out that the man was affirmatively either lying or withholding information about law enforcement contacts. Why doesn't that really overwhelm the suggestion that he was anti-government? You would have to reject the any possibility test articulated in Thomas to say that where the jury—where there are three suggestions in the jury's notes. It's not a smidgen. I mean, it's a three-sentence note. This is one of the three sentences. And it goes directly to the prohibited issue. That is what the Court meant by the rule. There is a possibility, and it's not a mere possibility. This is a strong possibility that the juror has a concern with the government's evidence because the witnesses are—lack credibility. And why? Because they have agreements with the government. And if you allow the government to then conduct a targeted, overnight investigation of this juror only, they come up with what I call a minor criminal record, and I think that's fair, and then go back and say he didn't tell the truth during voir dire. This is exactly what Thomas is talking about. It stems from the request to remove, stems from a possibility of a problem with the government's evidence. Can you walk me through the various concerns in the juror's note? Yes. So the first one, I have a problem with anyone who has an agreement with the government. Yes. Why doesn't that elicit some kind of concern about extrinsic bias, taking that first one? It's entirely possible that he is talking about the witnesses in this case, many of whom had the key witnesses' agreements with the government. It's also possible, the statement is, I agree with you, ambiguous, it's possible that he had a prior problem with that manner of prosecuting criminal cases. But Thomas deals with that by using an objective possibility test. What about the concerns about his refusal to deliberate in good faith? They did not say that. The juror's opinions, this is the other jurors, they don't quote him, they don't say he refuses to deliberate. They say he is not open to discussion, which is, there's a wide range of circumstances in the jury room that could have led the other jurors to say he's not open to discussion. He's not listening to us very well. But it doesn't say, like some of the other cases, we discuss many cases like this, there are some where the juror flat out sitting there with arms crossed and refuses to talk, refuses to deliberate. There are cases like that. And if that's the only problem, that juror is going to be removed and there's no argument. This is Judge Winter. Hello, Judge. Hi. What difference does the, why are you giving such dispositive weight to the juror's question? It's clear that the judge disqualified the juror because the juror had lied. And he had several arrests. And he had been a victim of several crimes, whereas he had said he hadn't been. Suppose that information had come to the government independently, and there had been no question. The removal would have been perfectly proper. Why isn't it perfectly proper here? Because in this, I understand the question. Because in this case, what led to the investigation is a note which, in substantial part, raises more than a mere possibility, certainly an objective possibility of a problem with the government's evidence. If you allow the test to turn on what the ultimate rationale for the removal of the juror, and what Your Honor stated is quite, is entirely accurate about what the record shows. The ultimate, if it's simply a question whether the ultimate ground for removal of the juror was a proper ground, you've completely eviscerated the test that prohibits parties from pursuing their voir dire concerns throughout the trial and into the deliberations period, and targeting a juror who they suspect is against them, and going back to find some reason to remove that, some other reason to remove the juror that will satisfy the court later. That's exactly what Thomas prohibits. So I'll reserve my minute. I've run over, and I appreciate your indulgence. Thank you. Mr. Smith. May it please the Court. My name is Micah Smith, and in addition to representing the United States in this appeal, I was one of the assistants who represented the United States in the proceedings below. The appellant argues that Judge Kodal abused his discretion in two ways. First, he contends that Judge Kodal admitted too much evidence about an arson that led to a murder that was unplanned at the beginning of events, an arson that was committed in furtherance of the appellant's drug business. Today, the appellant contends that the error was not in admitting too much evidence, but in admitting evidence to begin with. That argument was well addressed by Judge Kodal in thorough findings where he determined, based on his familiarity with the witnesses and the facts that they would be testifying about, from having presided over a prior trial, that the government's presentation of proof was appropriate, both to develop the background of the conspiracy and the relationship between the witnesses under United States v. Diaz and United States v. Gonzalez, and also because the appellant intended and did not decline that he intended to cross-examine the witnesses about that jiggly-o, making it appropriate under United States v. Coonan for the government to present that in its direct examination of the witnesses. With respect to the second argument that the appellant makes on appeal, the appellant contends that Judge Kodal abused his discretion in excusing a juror who had, in Judge Kodal's factual findings, deliberately lied or withheld information during the voir dire process in order to secure a seat on the jury, and in addition, Judge Kodal noted, in order to conceal what appeared to be anti-police bias. Judge Kodal carefully handled both the inquiry of the juror and the manner in which that inquiry arose. When the note was initially presented to Judge Kodal on June 24, 2015, it said three things. First, it said that several jurors had concerns about juror number two. On one occasion, he indicated that he had a problem with anyone who had an agreement with the government. But that's what Mr. Goldberger focuses on. Obviously, not obviously, but a party is unlikely to object to a juror that it believes is going to vote in its favor. And what Mr. Goldberger is arguing, I think, is that there is a suggestion here that he is anti-government. I have a problem with anyone who has an agreement with the government. And to extend Mr. Goldberger's remarks, we don't want any gamesmanship in terms of who the jury is comprised of going into jury deliberations. He says that's the danger here, and he says Thomas doesn't permit that. What's your response? Yes, Your Honor. United States v. Thomas was concerned with allowing breathing room for jury nullification. And so I'll address that in more detail in just a moment. But United States v. Thomas was concerned with a different problem, which was the concern that a juror who identifies him or herself or who is identified by fellow jurors as someone who apparently is not willing to follow the judge's instructions on the law, that what may in fact be happening is that the juror has concerns about the government's evidence. And so United States v. Thomas establishes a rule. And the rule is that because it is exceedingly difficult to distinguish between a desire to disregard the law, which United States v. Thomas says is an appropriate basis for removing a juror, and on the other hand a juror's view of the evidence, which would not be an appropriate basis for removing a juror, a court should not remove a juror on the grounds of jury nullification unless there is no possibility that the juror is in fact seeking to be removed or that the removal is based on a view of the evidence. If the government's decision to run the criminal record check had been solely motivated by juror number two's views on the sufficiency of the evidence, is it your position that his criminal record could still be used to remove the juror from this case? Your Honor, I think that would be a much more difficult case, and I can say that's not what happened here. And there would be some limits on what the government is able to do in a situation like that. This court has recognized limits on the ability of the government to investigate jurors when they have suspicions about potential juror misconduct or biases. That is not what happened here, Your Honor. What happened in this case was that in response to the note, Judge Kotal asked the parties what they thought the appropriate way of handling the issue was. The government indicated that there had been questions during voir dire about any biases individuals had with respect to witnesses who had agreements with the government. Juror number two expressed no concerns about that. In addition, the note made clear that the jurors felt that he would not be able to follow the judge's instructions with respect to the law and that he was refusing to deliberate. Why do a criminal record review, in other words, refusal to deliberate in good faith or hostile interaction between jurors, does that necessarily suggest that a criminal record review is appropriate? Let me take this in two steps, Your Honor. With respect to the note itself, the government did not investigate or did not look at juror number two's criminal history records in response just to that note. What the government did in response to that note and what Judge Kotal did in response to that note was, first of all, to discuss what the appropriate steps should be. The government said that the note suggested the possibility that juror number two was not willing to follow the court's instructions on the law and therefore asked Judge Kotal to inquire simply whether juror number two would be able to follow the court's instructions. As the government made clear, if juror number two said, yes, Your Honor, I do believe I can follow the court's instructions on the law, then the government felt that that would be the end of the inquiry. Judge Kotal, nevertheless, in light of the concerns in United States v. Thomas and the need for a court to exercise restraint in inquiring of jurors, declined to inquire of juror number two at that point. The jury later in that day returned to the courtroom, and at transcript pages 933 to 934, before the jurors were excused for the day, juror number two had an extraordinarily unusual interaction with the remainder of the jurors. And it was in light of the government's perception of something unusual about juror number two and the possibility that he might have a connection to this case that led the government to look at the possibility. Could you describe that a bit more? Yes, Your Honor. It's very amorphous because unusual interactions could be nothing more than disagreements about the case or the evidence or anything. What is it that led you then to do a criminal record investigation? The reaction that the juror had to the remainder of the jurors in the courtroom made us feel connected to it when viewed against the backdrop of the note, raised concerns for us approximately three weeks after this court had decided United States of Congress. That's what I'm trying to understand. What are you talking about? The concerns were simply that juror number two appeared very hostile toward the remainder of the jurors in the jury. That hostility is captured at transcript pages 933 to 934. We also mention it later when we're having a conversation with Judge Kodal. Essentially what happens is that juror number one, the forewoman, at the very end of the day when Judge Kodal instructed the jurors that they all needed to follow the court's instructions, raised her hand and said that she had a question for the court. Juror number two, in a very hostile way, turned to her and said, it's not a question. Judge Kodal said that the jurors should not raise questions in court in that manner. And before Judge Kodal had the opportunity to say that, juror number two appeared to be trying to stop the forewoman from saying to Judge Kodal what her concern was. He said, it's not a question. It's not a question. The remainder of the jurors then almost in unison said, it is a question. The concern that we had was that it was possible in our view that juror number two had somehow indicated either some connection to the parties, to the case, the locations, or some other connection that could turn out to be a bias. And now- I'm sorry. From the interaction you've just described, that's what you took? You thought there may be some connection to the case? We thought there was a possibility, Your Honor, in light of that interaction. Given the fact that during voir dire there had been no indication that juror number two would act in that manner. And he had disclosed no possibility of any bias of that sort. And so we were concerned. And if you'll recall, Your Honor, this was happening on June 24th, which was approximately two weeks after this court decided United States versus Parse, in which the court vacated a conviction because a juror turned out to have lied during voir dire about biases that weighed in favor of the government. And we had no way of knowing what these potential biases could turn out to be, if there were any. So we conducted a quick check to see if juror number two might have any arrests with any relevant players, whether juror number two might have any interactions with law enforcement that could disclose any biases. It seems that in the district court, you seem to rely pretty heavily on your concern about the cooperating witnesses' statements, the jurors' statements. But in your brief, that seems to more or less drop out. Am I correct? I wouldn't say, Your Honor, that we relied any more heavily in the district court on the statement about the cooperating witnesses. This was after juror number two was removed. The trial counsel for the appellant argued that there had been government misconduct. The government discussed this before Judge Kotel and explained the reasons why we had concerns that there might be some connection between juror number two in this case. And we indicated that the interaction that juror number two had in court was a significant part of the reason why the government had that concern. The concern that one might have is that his expression about his views about cooperating witnesses may have been the motivating view as to the government's undertaking of a criminal record search. I'll address that in two ways, Your Honor. The first is, obviously, that was something that the government took into consideration. But it was not the only reason, and it was not the motivating reason why the government inquired into the juror. The motivating reasons included, as I mentioned before, the juror's interaction in court. And in addition, the juror's described refusal to deliberate and apparent inability to follow the judge's instructions. Do you consider that to be an extrinsic bias? We believe that there was some indication that there might be an extrinsic bias. And so we would never have asked for, and we didn't ask for, Judge Kotel to remove juror number two on the basis of the note alone. Our request was simply that Judge Kotel inquire of the juror. And he declined to do so. And that's what's significant about Judge Kotel's handling of this issue. Judge Kotel, recognizing that it is important to be cautious in how one inquires of a juror, did not inquire of the juror at that point. He was later then presented. We get a circumstance where he's cautious, but then you can do the criminal record investigation? Your Honor, a couple of things about that. First of all. That's a question. Yes, Your Honor. A couple of things about that. The criminal history investigation that the government conducted in this case did not in any way impinge on the jury's deliberation. There was no contact between jurors. There were no steps taken in any way to affect the jury's analysis. The government pulled a rap sheet that had a pending case involving an arrest for criminal possession of marijuana, for which juror number two had been arrested just four months before the trial, or six months before the trial had begun. And that still appeared on the juror's rap sheet. And so this is not the sort of government investigation of the sort that this court has expressed concerns about in, for example, United States v. Motton. This is different from, in your view, from a situation where a juror appears to be a holdout, and then an investigation is done to basically knock that juror off. That is correct, Your Honor. And I would note that during Voidir there were jurors, not juror number two, but there were other jurors who expressed an understandable concern about whether they'd be able to fairly evaluate the testimony of witnesses who had agreements with the government. And all the parties at that point agreed that a further inquiry would be appropriate when a juror expressed concerns of that sort. And in one instance there was a juror who was able to say that I believe I could still fairly evaluate that evidence, and that juror was allowed to remain in the veneer. And there was another juror who said that I don't think I would be able to fairly evaluate it, and all the parties agreed that that juror should be removed. It is not in the government's experience an unusual suggestion for a juror before any meaningful deliberations had begun to say that there may be some concerns about witnesses who have agreements with the government. There is no indication in the note that the juror said that in light of those concerns, he would be unable to fairly evaluate the rest of the government's evidence, which included the testimony of Clara Ventura, who had no agreement with the government, and Nouris Castellano, who testified pursuant to a trial subpoena, and whose testimony would have been sufficient to sustain a conviction. So the issue was not any concern that juror number two was a holdout when deliberations had not even gone on for a day by this point, the note having come on June 24th, and the jury having been charged in the afternoon of the previous day. You talk about, you characterize the juror note as setting forth, as you put it, with unusual specificities on page 41. Juror number two's refusal to deliberate in good faith. But that seems to be somewhat different from the district court's understanding of the note, which it viewed as, and I quote, an early indication by the jury that it is having some difficulties reaching a verdict, evidence that there were, quote, disagreements with one juror, and an initial indication that other jurors are not getting along with one juror. What he said seems to have been different from what you're saying. I would say, Your Honor, that the two sides are not actually different. What the government was proposing was, in light of the concerns that juror number two appeared not to be willing to deliberate, that the court should inquire further. What, at least as I understand it, Judge Kodal said in response was that it was too early to really have any concerns that that was going on, and therefore did not inquire of the juror. But the government at no point suggested that in light of this fairly cryptic on the question of why juror number two was refusing to deliberate, that juror number two should be removed. That was never the government's request. And, in fact, the next day when the government returned with evidence that juror number two may have, in a number of significant ways, either falsely withheld information or lied during voir dire, did not even at that point request, based on that information, that juror number two be removed. Again, the government's request was that juror number two be asked questions about this to determine whether those lies reflected some bias or some other reason why juror number two should, in fact, be removed. Judge Kodal then conducted an inquiry on the basis of that evidence and reached the conclusion, not challenged on appeal, that juror number two did, in fact, falsely provide information during voir dire because he, in Judge Kodal's words, very much wanted a seat on this jury, and Judge Kodal felt that this was a juror who was biased. United States v. Thomas recognizes the importance of preserving every defendant's right to have impartial jurors consider the government's evidence and reach a verdict consistent with their consciences. What United States v. Thomas does not protect is a defendant's right to a partial juror. And as this court has recognized in cases following United States v. Thomas, including United States v. Baker and United States v. Spruill, that if there are reasons unrelated to the possibility that a juror might have doubts about the government's evidence, that a district judge considers and relies upon in removing a juror, that that falls outside of the concerns that Thomas is designed to protect. Thank you, Your Honor. Just two quick points on the second issue. The government's four-minute testimony of matters outside the record is a perfect illustration of why Thomas was so wise in articulating an objective, not a subjective, rule. Any possibility, that's an objective test. If we are going to get into prosecutors testifying about what their motives were to look into a jury, which is not on this record anywhere, we will always have a problem getting to, rooting out improper efforts to push a skeptical juror off. The motive is not the test, and the court should not consider anything that you've heard about motive. Can I ask you with regard to motive is not the test, is this a test that applies only to the government in a criminal case, or is it a test that applies to all parties to litigation before a jury? All parties have a right in civil and criminal cases to an impartial jury, and the government has an entitlement to an impartial jury even in a criminal case. But the defendant's right under the Sixth Amendment is unique, and I would not, I don't need to argue and wouldn't argue necessarily that the very strict test articulated in Thomas works for the benefit of any party other than defendants whose interest is protected by the Sixth Amendment. Excuse me, if we have an objective test, why isn't the jurors significantly lying in questions in response to the GUAC project sufficient to remove them? The objective test looks to what the inquiry, the request to remove the juror, the original request to remove the juror and the inquiry stemmed from. The ultimate reason for removing the jury defeats the benefit of, to look only at that defeats the benefit of the rule. So if somebody came into, if there had not been a note from the juror, and someone approached, someone who knew juror number two approached the prosecutor and said he lied, somebody outside the jury said he lied significantly under oath, and the prosecutor then conducted the criminal record inquiry, that would have been all right to remove the juror. Is that your position? Yes, Judge Winter, that would be outside the Thomas case. Those facts would be outside the Thomas case. So the government, the second point, very quickly, that is that I think that there is a contradiction in the government's position where they say there was no indication that this juror was a holdout, and yet they emphasize a very negative interpretation of the so-called hostile interaction between the jurors, this juror against all the other jurors, which, by the way, during the colloquy with Judge Coltle, the juror said it's because he was the only smoker on the jury and he kept interrupting the deliberations by needing a break. That's why the jurors were against him. Thank you. Thank you. Thank you both for your arguments. The Court will reserve decision. Thank you.